**Laura HERMES, Plaintiff–Appellee,**

**v.**

**PFIZER, INC., Defendant–Appellant.**

**No. 87–4561.**

United States Court of Appeals, Fifth Circuit.

June 24, 1988.

Robert C. Galloway, Ann Bowden–Hollis, Galloway & Galloway, Gulfport, Miss., for defendant-appellant.

Joe S. Owen, Ben F. Galloway, Gulfport, Miss., for plaintiff-appellee.

Before BROWN, KING, and HIGGINBOTHAM, Circuit Judges.

PER CURIAM:

In this Mississippi diversity suit a jury returned a verdict of $800,000 [1] against defendant Pfizer, Inc. as compensation for plaintiff Laura Hermes' personal injury resulting from the use of the prescription drug Sinequan, a Pfizer product. We reject Pfizer's arguments that the evidence of the drug's potential side effect was insufficient to trigger a duty to warn and that there was insufficient evidence that the drug was a cause of injury, and we affirm.

I

A gynecologist prescribed Sinequan, a tricyclic antidepressant, for Laura Hermes, a 50–year old post-hysterectomy patient. Several days after taking the medication, Hermes developed "extrapyramidal" symptoms or a "hunting jaw." [2] Hermes sought treatment by an oral surgeon who referred her to a neurologist. The condition appears to be permanent.

Hermes filed this suit against Pfizer alleging strict liability and negligence. Hermes offered the testimony of Dr. Dewey Metts, the oral surgeon, Dr. Joe Jackson, the treating neurologist, Dr. Michael Bourgeois, the prescribing gynecologist, Dr. James O'Donnell, an expert in adverse drug reactions and licensed pharmacist, and, as an adverse witness, Salvatore Giorgiani a Pfizer employee responsible for maintaining adverse drug reactions reports. Pfizer presented the testimony of Dr. James Matheny, an expert in pharma-

---

1. We note that although Pfizer originally appealed the $800,000 damage award on the ground that it was excessive, the parties since the briefs were filed have executed a liquidated damages agreement. Thus, the amount of the jury award is no longer at issue.

2. "Hunting jaw" is characterized by joint pain, lack of control of the jaw and tongue muscles, slurred speech, drooling, and difficulty chewing.

cology. Dr. Armin Haerer, a neurologist who examined Hermes under court order, also testified at trial.

## II

Pfizer argues that the court erred in denying its motions for directed verdict, judgment n.o.v., and new trial because the evidence on the issues of duty to warn and causation was insufficient to support a jury verdict. On review of a motion for directed verdict or judgment n.o.v., we apply the test announced in *Boeing Co. v. Shipman*,[3] whether, in a light most favorable to the party opposing the motion, reasonable people could not arrive at a contrary verdict.[4] In reviewing a motion for new trial, we ask whether the verdict is against the great weight of the evidence.[5]

### A

■ A key issue in this appeal is whether Pfizer had a duty to warn Hermes of the possible side effect she experienced, whether it knew or should have known that the taking of Sinequan could cause permanent hunting jaw.[6] Whether there is a duty to warn turns on the manufacturer's actual knowledge and its "constructive knowledge as measured by scientific literature and other available means of communication."[7] A manufacturer has a duty to keep abreast of research, adverse reaction reports, and other scientific literature pertaining to its product.[8]

■ Pfizer argues that there was insufficient evidence of any knowledge of the possible side effect. It argues that not one expert testified that there had been any report of symptoms such as those experienced by Hermes. It cites to *Johnston v. Upjohn Co.*,[9] in which the court held that

"if such a reaction had never occurred before, defendant could not know about it or in the exercise of the required degree of care could not have found out about it, and absent knowledge of such reaction, there could be no duty to warn."[10]

Pfizer argues that in any event there is no evidence that it breached any duty to warn, pointing to its instructions insert and reference in *Physician's Desk Reference*, which noted the possibility of *temporary* extrapyramidal symptoms. Pfizer contends that it had no duty to warn of *permanent* symptoms because it "knew" of none.

Hermes argues, on the other hand, that Pfizer knew or should have known of the side effect. Her expert, O'Donnell, unequivocally stated that Sinequan could cause temporary and permanent hunting jaw. The jury also had before it an FDA computer printout of adverse drug reaction reports concerning Sinequan, evidence that reports of extrapyramidal symptoms were recorded as early as 1970.

We are persuaded that this evidence was enough for the jury to have concluded that Pfizer had sufficient knowledge to trigger a duty to warn. The court did not err in denying Pfizer's motion on this ground.

### B

A second key issue in this appeal is causation: whether her ingestion of the drug was the proximate cause of her injury and whether Pfizer's failure to warn was the cause in fact of Mrs. Hermes' ingesting Sinequan. The jury was instructed as follows:

> The plaintiff Laura Hermes has the burden of proving by a preponderance of the evidence, one, that her taking of Sinequan caused in fact the injury com-

---

**3.** 411 F.2d 365 (5th Cir.1969).

**4.** *Id.* at 373–74.

**5.** *See Robin v. Wilson Bros. Drilling,* 719 F.2d 96, 98 (5th Cir.1983).

**6.** *See Ezagui v. Dow Chemical Corp.,* 598 F.2d 727 (2d Cir.1979); *Stanback v. Parke, Davis & Co.,* 502 F.Supp. 767, 770 (W.D.Va.1980), *aff'd,* 657 F.2d 642 (1981).

**7.** *Dalke v. Upjohn Co.,* 555 F.2d 245, 248 (9th Cir.1977).

**8.** *See Lindsay v. Ortho Pharmaceutical Corp.,* 637 F.2d 87, 91 (2d Cir.1980).

**9.** 442 S.W.2d 93, 94 (Mo.App.1969).

**10.** *Id.* at 94.

plained of and, two, that the warning, if any, given by Pfizer to plaintiff's prescribing physician was inadequate and, three, that had an adequate warning been given, a reasonably prudent physician would not have prescribed Sinequan.[11]

Pfizer contends that Hermes failed to meet her burden as to cause in fact because the only evidence on this point was O'Donnell's testimony that Hermes' symptoms were caused by the ingestion of Sinequan.[12] It contends that while generally a question relating to the base of an expert's opinion should be left to the jury, there was no foundation for O'Donnell's conclusions.

In *Viterbo v. Dow*,[13] we noted the general rule cited by Pfizer but held:

> In some cases, however, the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion. Expert opinion testimony falls into this category when that testimony would not actually assist the jury in arriving at an intelligent and sound verdict.... If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury. Furthermore, its lack of reliable support may render it more prejudicial than probative, making it inadmissible under Fed.R.Evid. 403.[14]

Pfizer argues that under *Viterbo*, O'Donnell's testimony should not have gone to the jury. Basically, Pfizer argues that Hermes' "expert" wasn't and that no other medical doctor testified that Sinequan caused Hermes' problems.

We are not persuaded that O'Donnell's testimony was so unfounded that the jury should not have been presented with this evidence. There is nothing that generally disqualifies a non-physician as an expert on causation.[15] Furthermore, the oral surgeon, Dr. Metts, also testified that his mother had had a similar reaction to Sinequan and that her symptoms had ceased once he took her off the medication.[16] This was enough evidence to submit the issue to the jury.

Finally, Pfizer argues that Hermes did not meet her burden of establishing that had an adequate warning been given, a reasonably prudent physician would not have prescribed Sinequan for her. On this point, the jury was presented with the evidence of Dr. Metts, who testified that he took his mother off Sinequan once she experienced symptoms like Mrs. Hermes experienced,[17] Dr. O'Donnell, who testified that in his opinion "if an adequate warning would have been given, she would not have the injuries she has today,"[18] and Dr. Haerer, who testified that, based on the information then contained in the *Physi-*

---

**11.** Record on Appeal at 443.

**12.** *See Id.* at 244 ("It is my opinion with a reasonable degree of certainty that this lady's injuries to her face and mouth were caused by the Sinequan.")

**13.** 826 F.2d 420 (5th Cir.1987).

**14.** *Id.* at 422 (citations omitted).

**15.** *See Sonford Products Corp. v. Freels*, 495 So.2d 468, 473 (Miss.1986) ("It is this Court's opinion that [a toxicologist] is qualified to give an opinion regarding such 'cause in fact' and should not be disqualified from testifying because his degree is a Ph.D. instead of an M.D. The ... inquiry should be whether the witness is in fact qualified—by knowledge, skill, experience, training or education—not by what degree he holds. It is certain and probable that Ph.D. biochemists and toxicologists are at least equally competent to testify as to the cause and effect of chemicals in an environment as medical doc-

tors."); *Wells v. Ortho Pharmaceutical Corp.*, 788 F.2d 741, 744 n. 5 (11th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986); *Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652, 660 (1st Cir.1981).

**16.** *See* Record on Appeal at 72–73 ("[C]oincidentally, it happened that about a month previously my mother, who was quite elderly, was on the same medication.... [M]y mother had the same problem that Mrs. Hermes was having, and that is uncoordinated movements of her lower jaw and tongue, and her facial expression was just frozen.... I took her off [the Sinequan] and about, I don't know how many days or weeks it was, but her problems slowly resolved. And the advice I gave to Mrs. Hermes [to quit taking Sinequan] was based solely on the experience with my mother.").

**17.** *See Id.*.

**18.** Record on Appeal at 251.

*cian's Desk Reference,* he would prescribe Sinequan for treatment of "[s]ome type of symptom that could only be helped by that drug."[19] When viewed in the light most favorable to Hermes, this evidence was sufficient to allow the jury to decide the issue of causation, and when combined with a jury's permissible inferences,[20] was sufficient to support the jury's determination that had an adequate warning been given, a reasonably prudent physician would not have prescribed Sinequan for Mrs. Hermes.

We AFFIRM.

---

19. *Id.* at 171–72.

20. *See Ferebee v. Chevron Chemical Co.,* 736 F.2d 1529, 1539 (D.C.Cir.) ("[w]e hold that the jury could properly have inferred that, had a warning about the danger of disease ... been included on the label, that warning would have been communicated to [the plaintiff] and that he would as a result have acted differently."), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984); *Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1281 (5th Cir.) (holding that, under Texas law, there is a rebuttable presumption that a physician would have heeded a warn-

ing and altered the course of treatment.), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974); *Restatement (Second) of Torts* § 402A comment j (1966) ("where a warning is given, a seller may reasonably assure that it will be read and heeded.") Furthermore, Hermes herself testified that she would not have taken the Sinequan had she known that it could cause the injury she experienced. *See* Record on Appeal at 28–29.