Beverly WINDHAM, and her husband, Mikell Windham, Plaintiffs,

v.

WYETH LABORATORIES, INC., Defendants.

Civ. A. No. H88–0200(P).

United States District Court, S.D. Mississippi, Hattiesburg Division.

Feb. 14, 1992.

David J. L'Hoste and Charles R. Ward, Jr., New Orleans, La., for plaintiffs.

Lee Davis Thames and Anne V. Winter, Jackson, Miss., for defendants.

## MEMORANDUM OPINION AND ORDER

PICKERING, District Judge.

This cause comes before the Court pursuant to the Motion for Summary Judgment of Defendant Wyeth Laboratories, Inc. Having reviewed the motion and the parties' authorities, exhibits and memoranda in connection with same, the Court finds as follows:

## I.

### FACTUAL BACKGROUND

The Plaintiffs in this case, Beverly Windham and her husband, Mikell Windham, are adult resident citizens of Marion County, Mississippi. The Defendant, Wyeth Laboratories, Inc., is a foreign corporation doing business in Mississippi with its principal place of business in a State other than Mississippi. Therefore, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

Beverly Windham and her husband, Mikell Windham ("the Windhams") filed this action seeking actual and punitive damages from Wyeth Laboratories, Inc. ("Wyeth") based upon Wyeth's allegedly improper conduct in manufacturing and placing onto the market a certain Phenergan suppository. In their Complaint, the Windhams charge Wyeth with breach of warranty, strict liability in tort, and negligent development, design, manufacture, marketing and distribution of Phenergan suppositories.[1]

Phenergan is a prescription drug which can only be obtained on doctor's orders. That is, the medication is not available over the counter to the average consumer but may only be obtained under a valid prescription from a physician.

On July 5, 1984, Mrs. Windham, who was approximately 12–15 weeks pregnant at the time, called and spoke with Dr. Lamar Gillespie seeking relief from persistent nausea and vomiting. Although Dr. Gillespie was not Windham's primary physician, Gillespie was a member of the obstetrical/gynecological group whom Windham had used for several years. Dr. Gillespie was "covering" for Windham's primary physician, Dr.

---

1. The name "Phenergan" is a Wyeth trademark for the prescription medication also known by its chemical name, promethazine hydrochloride. The medication was first developed in France and first approved by the Food and Drug Administration for marketing by Wyeth in 1951. *See* Affidavit of P. Uses, Exhibit 8 to Motion for Summary Judgment.

Raulston, who was not available on the day in question.

After discussing the situation with Mrs. Windham, Dr. Gillespie prescribed four 50–milligram Phenergan suppositories for her nausea and vomiting. Mrs. Windham used one of the four suppositories at that time, on or about July 5, 1984, and experienced no adverse reaction to the medication.

When he prescribed Phenergan to Mrs. Windham, Dr. Gillespie was aware of possible adverse reactions to the medication. However, he prescribed Phenergan anyway because "I felt that she really needed a drug and she had to have a drug, and I felt that it had probably the fewest adverse reactions of anything I could use that worked and we used it enough to know it works better than most anything else." Deposition of H. Lamar Gillespie, M.D., Exhibit 1 to Motion for Summary Judgment at 43–44.

The direction circular included with Phenergan in 1984 did not contain any statement to the effect that extrapyramidal symptoms were a possible adverse reaction to Phenergan. Nor did the direction circular contain a statement to the effect that Phenergan should be used in pregnancy only if the potential benefit justified the potential risk. *See* Affidavit of P. Uses, Exhibit 8 to Motion for Summary Judgment, Exhibit "A" to Affidavit. The Phenergan direction circular, as revised in March 1987, now contains statements about possible extrapyramidal reactions and advises caution when using Phenergan during pregnancy. *See* Exhibit "B" to Exhibit 8 to Motion for Summary Judgment. However, Dr. Gillespie testified in his deposition that even if the 1987 circular had been available to him in 1984 when he prescribed Phenergan to Mrs. Windham, he would still have prescribed Phenergan. Deposition of H. Lamar Gillespie at 43.

Over three years after the Phenergan suppositories were prescribed by Dr. Gillespie, Mrs. Windham used one of the remaining suppositories from the 1984 prescription. On October 19, 1987, when she again was suffering from nausea, and without consulting any physician before doing so, Mrs. Windham used one of the Phenergan suppositories.

Within approximately ten minutes of inserting the suppository, Mrs. Windham's body began to cramp and she "drew up all over." Her apparent reaction to the drug included muscle spasms primarily of the face, neck, legs, and feet. When these spasms did not resolve themselves, Mrs. Windham sought treatment from Dr. Geoffrey Hartwig, a neurologist in Hattiesburg, Mississippi.

Fragmentary and incomplete body movement, muscle spasms, and abnormal posturing (or "drawing up" of the limbs or extremities) are part of a group of adverse drug reactions referred to generally as extrapyramidal symptoms because of the involvement of the extrapyramidal nervous system. These symptoms include dystonia (peculiar or involuntary posturing of the body), trismus (a spasm of the muscles of the lower jaw), torticollis (abnormal contraction or distortion of the neck muscles) opistholonus (spasms of the back and limbs), muscle rigidity and similar symptoms.

Over the next several months, from October 1987 through January 1988, Mrs. Windham was hospitalized on no fewer than four occasions for treatment involving the dystonia (i.e., involuntary muscle movements or contractions) which began after she used the Phenergan suppository on October 19, 1987. Although the spasms of her muscles improved with time, the posturing of Mrs. Windham's left ankle and foot persisted for some time. Windham also attributed difficulties she experienced with temporo-mandibular joint disorder ("TMJ"), headaches, and a hypotonic bladder to the adverse reaction she suffered to the Phenergan suppository. On the issue of causation, Dr. Hartwig, Windham's treating physician, testified by deposition that "I don't have the origin for that...." Deposition of Geoffrey Hartwig at 39. In his deposition, Dr. Hartwig stated that he was of the opinion that the dystonia may have been related to Mrs. Windham's use of the Phenergan suppository but also may have been caused by an upper respiratory

viral infection Mrs. Windham had at the time she used the suppository. *Id.* Mrs. Windham had been taking the drug Rondec DM, a prescription antihistamine, for some eleven days prior to the time she used the Phenergan suppository on October 19, 1987. However, the medical records prepared by Dr. Hartwig reflect that when he saw Windham on or about November 2, 1987, he diagnosed her problem as "prolonged dystonic reaction, presumably Phenothiazine-induced." Plaintiff's Exhibit 9 in Opposition to Motion for Summary Judgment. Again on November 9, 1987, Dr. Hartwig reported in his office notes that Mrs. Windham's problem was "prolonged dystonic reaction secondary to Phenothiazines." *Id.*

Mrs. Windham and her husband attribute all of her physical ailments to the adverse reaction she experienced to use of the Phenergan suppository on October 19, 1987. Thus, they seek to impose liability upon Wyeth under various theories, including strict liability in tort, breach of warranty, and negligent design, manufacture, marketing and distribution of the Phenergan suppositories. Wyeth moves for summary judgment on all aspects of the Complaint.

## II.

### CONCLUSIONS OF LAW

#### A. *Summary Judgment Standard*

The language of Rule 56 of the Federal Rules of Civil Procedure states clearly that:

> [S]ummary judgment *shall* be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

*Fed.R.Civ.P. 56(c)* (emphasis added). The compulsory language of Rule 56(c) has lead the United States Supreme Court to conclude that the Rule "mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing to establish the existence of an essential element [of] that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Even so, summary judgment may only be granted when everything in the record demonstrates that no genuine issues of material fact exist. Thus, summary judgment is proper when it can be shown that a trial would serve no useful purpose. *Fontenot v. Upjohn Company,* 780 F.2d 1190, 1197 (5th Cir.1986).

In reviewing a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (*citations omitted*). In evaluating Wyeth's motion for summary judgment, the Court must afford the Windhams the benefit of all favorable inferences which the jury could justifiably draw from the facts alleged in the opposing affidavits and materials presented. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The various claims made by the Windhams against Wyeth all relate primarily to the issue of the adequacy of Wyeth's warning and merge into two principal issues: (1) whether Wyeth failed to warn of the possible adverse reaction of extrapyramidal symptoms from the use of Phenergan suppositories; and, (2) whether that failure to warn, if any, proximately caused Mrs. Windham's alleged injuries. Based upon the record presented in this matter, the Court finds that Wyeth's motion for summary judgment should be sustained as to last of these issues, causation.

#### B. *Failure to Warn*

While Plaintiffs assert in their Complaint a broad-based negligence claim alleging negligent development, design, manufacture, marketing and distribution of Phenergan suppositories, the record developed thus far has focused essentially on the

adequacy of Wyeth's warnings related to the possibility of extrapyramidal symptoms resulting from use of Phenergan suppositories. Thus, the Court limits its inquiry here to the issue of Wyeth's alleged failure to warn of the possible incidence of extrapyramidal symptoms after use of Phenergan suppositories.

### 1. WARNING DUE DR. GILLESPIE

In this diversity action, the substantive law of the State of Mississippi controls. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Mississippi has adopted and adheres to the so-called "learned intermediary" doctrine, which holds as a general rule, " 'that where prescription drugs are concerned, a manufacturer's duty to warn only extends to physicians and not to laymen.' " *Wyeth Laboratories, Inc. v. Fortenberry*, 530 So.2d 688, 691 (Miss.1988) (*quoting Swayze v. McNeil Laboratories, Inc.*, 807 F.2d 464, 470 (5th Cir.1987)). The Fifth Circuit elaborated upon the "learned intermediary" doctrine in the case of *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1276 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974):

> As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as a "learned intermediary" between manufacturer and consumer.

Application of the learned intermediary doctrine produces the result that "if the warnings are adequate to the physician, then the manufacturer ordinarily is freed from liability." *Thomas v. Hoffman–La Roche, Inc.*, 731 F.Supp. 224, 228–229 (N.D.Miss.1989). As noted, the rationale for the learned intermediary doctrine is "that the physician, through education, experience, and special training is in the best position to make a benefit/risk analysis in making the determination to prescribe a particular drug for a specific patient." *Id.* at 229. Accordingly, based upon these authorities, the Court finds that any warning in this instance was due Dr. Lamar Gillespie, who prescribed the Phenergan suppositories to Mrs. Windham. In this connection, the Court rejects the Windhams' contention that there existed no physician-patient relationship between Dr. Gillespie and Mrs. Windham. Insofar as Dr. Gillespie discussed Mrs. Windham's condition with her and reviewed her medical history prior to making the decision to prescribe the Phenergan suppositories, the Court concludes that there existed a patient-physician relationship which dictates the application of the "learned intermediary" doctrine in this case. As an *Erie*-bound court, this Court is not empowered to alter existing Mississippi law.

This Court notes Windham's argument that although Dr. Gillespie originally prescribed this medication during her pregnancy in 1984, Windham took this medication on the occasion complained of, when the injury occurred, for an illness for which she had not consulted either Dr. Gillespie or any other doctor. In other words, on October 19, 1987, she took the medicine as she would have taken an over-the-counter drug without advice from any doctor. Windham, therefore, argues that Wyeth was duty bound to provide an adequate warning to her as well as to the physician who prescribed the medication. If Wyeth owed a duty to warn Windham adequately, as well as her doctor, the "learned intermediary", there is no doubt that the facts of this case would present a jury question. This Court has some sympathy with the Windham's argument that if she had been given an adequate warning, she would not have taken the drug and would not have suffered the injury. Nevertheless, since this was a prescription drug, the Court concludes that the decisions of the Mississippi Supreme Court and the Fifth Circuit, as cited above,

require application of the "learned intermediary" rule.

## 2. ADEQUACY OF THE WARNING

■ Having established that the warning in this case was due Dr. Gillespie, the Court then must determine whether an adequate warning was given Dr. Gillespie prior to the time he prescribed the Phenergan suppositories to Mrs. Windham in July 1984. The adequacy of the warning implies that the warning had some causal connection to the Plaintiffs' injuries. As the Mississippi Supreme Court said in *Wyeth Laboratories, Inc. v. Fortenberry:* "Causation is more than just cause-in-fact. Proximate, or legal cause, must be proven." *Id.,* 430 So.2d at 691.

By necessity, the adequacy of the warning must be viewed from the context of the possible effect it may have had on Dr. Gillespie's conduct. In short, the "plaintiff in a prescription drug products liability case has the burden of proving that an adequate warning to the prescribing physician would have altered the physician's conduct." *Thomas v. Hoffman–La Roche, Inc.,* 731 F.Supp. at 229. That is, if a further warning would not have altered Dr. Gillespie's conduct, then any failure to warn would not be the proximate cause of Mrs. Windham's injuries.

The manufacturer's duty to warn a physician is "a duty to warn the prescribing physician of any known adverse effects which might result from use of its prescription drugs." *Wyeth Laboratories, Inc. v. Fortenberry,* 530 So.2d at 691 (*citation omitted*). Here, the Windhams suggest that Wyeth should have warned Dr. Gillespie of the possible occurrence of adverse reactions or extrapyramidal symptoms resulting from use of Phenergan suppositories. However, Dr. Gillespie testified that when he prescribed Phenergan to Mrs. Windham in 1984, he was aware of the possibility of such extrapyramidal symptoms and that he weighed the risk of the drug against the benefit of the drug. Deposition of H. Lamar Gillespie at 42.

In fact, as Plaintiffs point out, Dr. Gillespie was aware that reactions to Phenergan were possible, but "very rare." *Id.* at 38–39. While Plaintiffs seek to attack Dr. Gillespie's credibility in this case, Plaintiffs do not dispute Dr. Gillespie's testimony that, despite the lack of any warning in 1984 about the safety of the use of Phenergan during pregnancy, Dr. Gillespie considered the risks associated with use of the drug before prescribing it. More importantly, Dr. Gillespie went further and testified that even had he been provided the 1987 *direction circular, he still would have prescribed* Phenergan to Mrs. Windham. As Dr. Gillespie explained, "I did it because I felt that she really needed a drug and she had to have a drug, and I felt that it had probably the fewest adverse reactions of anything I could use that worked...." Deposition of H. Lamar Gillespie at 43–44.

This Court recognizes that Dr. Gillespie was testifying about a hypothetical situation—one with which he in fact had not been confronted. He did not have available to him the revised warning when he prescribed Phenergan to Windham in 1984. However, he testified that even if he had had the additional information contained in the revised direction circular, that he still would have prescribed Phenergan. Windham argues that since Dr. Gillespie is testifying about a hypothetical situation rather than about the situation with which he was actually confronted, that a jury should determine whether an additional warning would have changed Dr. Gillespie's course of conduct. Windham makes this argument in spite of Dr. Gillespie's statements that it would not have altered his conduct. Accordingly, this Court concludes that under the authority of the Mississippi cases and Fifth Circuit decisions, this is not a question for the jury in view of Dr. Gillespie's unequivocal testimony. The Court would note that had Dr. Gillespie's testimony been equivocal or uncertain on the issue of whether he would have prescribed Phenergan even with the benefit of the 1987 direction circular, the Court would reserve the issue of credibility for the jury's determination.

### C. Proximate Cause

■ There are two questions to be resolved by the Court as to proximate cause. First, did the taking of the Phenergan

cause Windham's extrapyramidal symptoms. Even Dr. Hartwig's deposition testimony is that he could not determine the cause of Windham's extrapyramidal problems; nevertheless, his clinic notes are rather straightforward. Before a lawsuit was filed, Dr. Hartwig had no problem determining that Phenergan caused Mrs. Windham's problems. This conclusion was reached by Dr. Hartwig as he sought to determine how best to treat Mrs. Windham's problems. An argument could be made that the prejudice resulting from the filing of a lawsuit affected Dr. Hartwig's opinion when he was deposed. Dr. Hartwig's conclusions are inconsistent. Thus, if Plaintiffs did not have problems with other essential elements of their case, this Court would present the question of whether Phenergan proximately caused Windham's extrapyramidal problems to a jury.

The second question relation to proximate cause has to do with the question of whether a more effective warning to Dr. Gillespie would have altered his conduct. Assuming, *arguendo*, that the warning given to Dr. Gillespie was inadequate, nevertheless, based upon the reasoning outlined in the preceding paragraphs, Plaintiffs have failed to show that a more thorough or more explicit warning about the possibility of adverse reactions such as extrapyramidal symptoms would have altered Dr. Gillespie's decision to prescribe Phenergan to Mrs. Windham. Absent such proof, Plaintiffs cannot establish that any failure to warn on the part of Wyeth was the proximate cause of their injuries. *Cf. Willett v. Baxter Intern., Inc.,* 929 F.2d 1094 (5th Cir.1991) (plaintiff must show that proper warning would have changed decision of treating physician); *Kirch v. Picker International, Inc.,* 753 F.2d 670 (8th Cir.), *reh'g denied,* 760 F.2d 183 (8th Cir.1985) (where physician had knowledge of danger of radiation therapy, failure to warn of such danger could not have been proximate cause of plaintiff's injuries); *Wyeth Laboratories, Inc. v. Fortenberry, supra* (warning was adequate where physician was aware of risks but chose not to give warning to patient); *Thomas v. Hoffman–La Roche, Inc., supra* (plaintiff failed to prove proximate cause related to alleg-

edly inadequate warnings where prescribing physician would have prescribed drug even if manufacturer had furnished suggested warnings); *Felix v. Hoffman–La Roche, Inc.,* 513 So.2d 1319 (Fla.Dist.Ct. App.1987), *approved* 540 So.2d 102 (Fla. 1989) (where physician was aware of dangers of drug at time he prescribed it, any inadequacy in warning was not proximate cause of damages).

On the whole, this case closely resembles the circumstances presented in the case of *Thomas v. Hoffman–La Roche, Inc.,* where the district court noted:

> In looking to the plaintiff's evidence, the court is of the opinion that had the defendant Hoffman–La Roche, Inc. given the warning suggested by the plaintiff's witness Dr. O'Donnell, the conduct of the prescribing physician, Dr. Robert P. Myers, would not have been altered.

*Id.* at 230. Even if it were unreasonable for Dr. Gillespie to prescribe Phenergan to Mrs. Windham under the circumstances, that question relates to Dr. Gillespie's potential liability, not to Wyeth's. Plaintiffs do not seek to impose liability upon Dr. Gillespie in this case.

The Court concludes that Dr. Gillespie functioned as a learned intermediary. Thus, "[a]pplication of the learned intermediary doctrine ... prevents liability from being found against Wyeth." *Wyeth Laboratories, Inc. v. Fortenberry,* 530 So.2d at 693. Since Plaintiffs have failed to prove an essential element of their claims against Wyeth, i.e., proximate cause, the Court holds that Wyeth is entitled to summary judgment on all claims presented in the Plaintiff's Complaint. Accordingly,

IT IS HEREBY ORDERED AND ADJUDGED that the Motion for Summary Judgment of Defendant Wyeth Laboratories, Inc. is granted;

IT IS FURTHER ORDERED AND ADJUDGED that the Complaint in this action be and it is hereby dismissed with prejudice;

SO ORDERED AND ADJUDGED.