**Ann R. GOLOD and Ervin H. Golod, Plaintiffs,**

v.

**HOFFMAN LA ROCHE d/b/a Roche Pharmaceuticals, Defendant.**

No. 93 Civ. 0564(RWS).

United States District Court, S.D. New York.

May 20, 1997.

Landman Corsi Ballaine & Ford, New York City (Mark S. Landman, Lisa A. Rabinowitz, of counsel), for Plaintiffs.

Patterson, Belknap, Webb & Tyler, New York City (Karl E. Seib, Jr., of counsel), for Defendant.

## OPINION

SWEET, District Judge.

Defendant Hoffman La–Roche, Inc. ("Hoffman") has moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P.

For the reasons set forth below, Hoffman's motion will be denied. In addition, certain expert testimony will be excluded at trial.

*Parties*

Plaintiffs Ann R. Golod ("Golod") and her husband Ervin H. Golod are individuals residing in New York, New York.

Hoffman is a foreign drug manufacturing company with its principal place of business in the State of New Jersey.

*Prior Proceedings*

This action was filed on January 29, 1993, seeking damages for Hoffman's failure to adequately test and warn against the dangers associated with the use of Tegison, a drug manufactured by Hoffman. Hoffman's motion for summary judgment was filed on March 16, 1996. On January 28, 1997 this action was transferred to this Court pursuant to Rule 16, Rules for the Division of Business Among Southern District Judges. Oral argument on Hoffman's motion was heard on February 6, 1997. Further submissions were received through February 28, 1997, at which time the motion was considered fully submitted.

*Facts*

In deciding a motion for summary judgment, "[a]s a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 2556 n. 2, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970)). The facts as presented here are construed accordingly, and they are limited to this motion.

## I. *Tegison*

Tegison is the brand name of a prescription drug manufactured and distributed by Hoffman. The chemical name of the drug is etretinate. Tegison is a retinoid, closely related to Vitamin A. Because it is a prescription drug, Tegison can only be prescribed by, and used at the direction of, a licensed physician. Tegison was approved for sale in the United States by the United States Food and Drug Administration ("FDA") on September 30, 1986.

Tegison is "indicated" to treat severe recalcitrant psoriasis. At all times relevant to the complaint, the Physician's Desk Reference ("PDR") and package insert for Tegison, which are approved by the FDA, stated in part:

INDICATIONS AND USAGE:

Tegison is indicated for the treatment of severe recalcitrant psoriasis.... Because of significant adverse effects associated with its use, Tegison should be prescribed only by physicians knowledgeable in the systemic use of retinoids and reserved for patients with severe recalcitrant psoriasis who are unresponsive to or intolerant of standard therapies....

1990 Physician's Desk Reference (44th ed.) at p. 1773.[1]

The 1986 Tegison package insert warns of adverse ocular effects using the following language:

WARNINGS:

Ophthalmic effects: Corneal erosion, abrasion, irregularity and punctate staining have occurred in patients treated with Tegison, although these effects were absent or improved after therapy was stopped in those patients who had followup examinations. Corneal opacities have occurred in patients receiving isotretinoin: they had either completely resolved or were resolving at follow-up six to seven weeks after discontinuation of the drug. Other ophthalmic effects that have occurred in Tegison patients include

---

1. A package insert is a document, directed to physicians, that contains, among other things, the indications, contraindications, warnings, precautions and side effect or adverse reaction information for a drug. The content and format of a package insert are strictly controlled pursuant to regulations issued by the FDA. *See* 21 C.F.R. § 201 (1995).

During the time period relevant to this lawsuit, the text of the Tegison package insert or prescribing information was reproduced in the Physician's Desk Reference ("PDR"), a standard reference of the medical profession.

decreased visual acuity and blurring of vision, night vision decrease, minimal posterior subcapsular cataract, iritis, blot retinal hemorrhage, scotoma and photophobia. Any Tegison patient experiencing visual difficulties should discontinue the drug and have an ophthalmological examination.

The January 1987 and August 1988 Tegison Patient Leaflet gives the following warning:

In the first few weeks—perhaps before you see any healing—you may begin to have some side effects ... [including] eye irritations. ... If you develop any of these side effects, check with your doctor to determine if any change in the amount of your medication is needed. ... A number of patients have experienced decreased night vision.

YOU SHOULD BE AWARE THAT TEGISON MAY CAUSE SOME MORE SERIOUS SIDE EFFECTS. BE ALERT FOR ANY OF THE FOLLOWING:

BLURRED VISION ... PERSISTENT FEELING OF DRYNESS OF THE EYES ...

IF YOU EXPERIENCE ANY OF THESE SYMPTOMS OR ANY OTHER UNUSUAL OR SEVERE PROBLEMS, DISCONTINUE TAKING TEGISON AND CHECK WITH YOUR DOCTOR IMMEDIATELY. THEY MAY BE THE EARLY SIGNS OF MORE SERIOUS SIDE EFFECTS WHICH, IF LEFT UNTREATED, COULD POSSIBLY RESULT IN PERMANENT EFFECTS.

The June 1988 Tegison Patient Information Brochure contains similar language.

## II. *Reports of Adverse Reactions to Tegison & Other Retinoids*

In an Adverse Experience Report[2] dated June 15, 1987, a patient on Tegison for five months reportedly suffered from unilateral scotoma (a blind spot) in his right eye. The report states that "no firm relationship to Tegison [was] made," but that the patient was not taking any other medications during those five months.

In November 1987, the FDA received an Adverse Experience Report from Hoffman about a 48–year old woman who suffered "some" loss of vision resulting from cataracts after a 5–month course of Tegison. The negative experience did not abate from the time the drug was discontinued until the time of the report.

Another Adverse Experience Report dated July 14, 1988, describes a patient on Tegison 2–3 months who experienced retinal holes and retinal detachment, as well as non-ocular side effects. Although the other effects subsided when Tegison was discontinued, the retinal problems did not. The retinal detachment was repaired, but the patient continued to have limited vision in the right eye. The report shows that although the patient had a history of psoriasis, it was not until he began his Tegison therapy that he developed numerous side effects, including a prominent cystic change in his right macular which restricted his vision. The report also states that an ophthalmologist felt that the eye problems were not related to Tegison therapy.

Hoffman also manufactures Accutane, a pharmaceutical product prescribed for severe acne. Like Tegison, Accutane is also a retinoid, closely related to Vitamin A. The Tegison package insert states that "Nearly all of the adverse events reported to date with Tegison administration resemble those of hypervitaminosis A syndrome [i.e., vitamin A poisoning]." The testimony of Dr. Kenneth R. Barasch ("Dr. Barasch"), one of Golod's experts, also provides some evidence that Vitamin A derivatives, including Tegison and Accutane, have similar side effects. Hoffman's own witnesses have conceded that there are some similarities in the side effects caused by retinoids. Dr. Robert Armstrong of Hoffman testified at his deposition that he did not know of any differences in the ophthalmologic side effects of Tegison and Accutane, other than that night blindness is

2. An Adverse Experience Report is an FDA report filed by health professionals, users or the manufacturer describing adverse events occurring in patients using a drug approved by the FDA.

more common with Accutane. Moreover, a report on post-marketing surveillance of side effects submitted to a Swiss medical publication, *Schweitzerische Aerztezeitung,* by Dr. T. Fisch of Hoffman La Roche and other physicians, combines Tegison and Accutane and notes that both "have a potential of causing any of the adverse reactions ... known to be associated with hypervitaminosis A. Many of these signs are only manifested after prolonged treatment." Hoffman also apparently used information on Accutane in preparing its package insert for Tegison, as the draft package insert for Tegison referred to Accutane. Hoffman made revisions to the Tegison patient leaflet in order to conform the Tegison leaflet to the then-recently approved Accutane leaflet. In addition, a June 12, 1985 Hoffman memo documenting Hoffman's meeting with the FDA concerning Tegison noted that Hoffman's post-approval program for Tegison included packaging for Tegison that would be similar to that for Accutane.

FDA Drug Experience Reports show that as early as 1982, patients reported debilitating eye symptoms that developed during or after a course of Accutane therapy. Several patients reported that the symptoms, which ranged from persistent dry eyes to various eye pains and cataracts, did not subside when they ceased taking Accutane.

Golod has also proffered computer printouts from the FDA's Spontaneous Reporting System, which include summarized reports of adverse experiences associated with (although not necessarily caused by) various drugs. Approximately ninety percent of the reports in this database are submitted directly by the manufacturers of the drugs, who must, under law, report adverse events that are made known to them. These printouts reflect two reports prior to 1990 of blindness in patients using Tegison. The printout for Accutane shows that in 1983, a 17–year old patient reported a total loss of vision in his left eye and a fifty percent loss of vision in his right eye, and, in 1984 and 1985, four patients reported blindness. These summaries do not indicate the duration of the blindness. Other than the 17–year–old, the sum-

maries do not indicate the severity of the blindness. None of the summaries states the clinical course of events leading to blindness.

### III. *Golod's Use of Tegison*

Golod has had psoriasis since 1973, when she was 37 years old. Her psoriasis had impaired her ability to perform daily activities such as walking, writing and working. In June 1981, Golod first consulted with Dr. Marc Grossman ("Dr. Grossman"), a board-certified dermatologist in White Plains, for treatment of her psoriasis which had resisted all previous standard forms of treatment.

In June 1985,[3] Dr. Grossman, who was a researcher for Hoffman, prescribed Tegison for Golod, which she used intermittently in various doses, as her psoriasis improved and worsened, until the end of July 1990, when she discontinued use of the drug. The dosage of Tegison varied over the course of her treatment, ranging from 25mg and as much as 100mg per day during each treatment. The total amount of Tegison which Golod ingested over the five years was 46 grams. Golod was generally overweight during her course of Tegison therapy.

After initially prescribing Tegison to Golod, Dr. Grossman supervised Golod's intermittent taking of the drug for about six years, until July 1990. From November 1984 to July 1990, Golod underwent nine discrete courses of therapy with Tegison. Dr. Grossman frequently adjusted Golod's dosage of Tegison in light of the severity of her psoriasis. Tegison was effective in ameliorating the physical symptoms of Golod's psoriasis.

### IV. *Golod's Medical History Between 1984 and 1990*

Within three weeks of beginning her first course of Tegison in November 1984, Golod began experiencing pain under her rib cage on her right side and tenderness in the area of her liver. In addition to Dr. Grossman, Golod consulted Dr. Marc Berenzweig ("Dr. Berenzweig"), her family physician since 1978, regarding these symptoms. Dr. Berenzweig considered the possibility that Golod

---

**3.** Defendants contend that Dr. Grossman first prescribed Tegison in November 1984.

might have a "retinoid induced hepatitis." He examined Golod and ordered that she undergo certain tests, including various blood tests and a sonogram. Golod temporarily discontinued the taking of Tegison in December 1984. Dr. Berenzweig ultimately concluded that she had an abdominal pain of unknown etiology.

Golod resumed Tegison therapy in January 1985. Less than one month later, while she was taking Tegison, Dr. Grossman noted the presence of what he called "eyelid dermatitis" and recommended an ophthalmic ointment to Golod.

While she was taking Tegison in the 1980's, Golod experienced a variety of other symptoms including: drying of the eyes and mucous membranes; itching and burning of the eyes; peeling of the palms and soles; the curling and partial loss of hair, eyebrows and eyelashes; disintegration of the fingernails; and what she termed "vitamin A poisoning." Golod has described her ocular problems as "prevalent" during the time she was taking the drug. Prior to 1985, the time she began taking Tegison, Golod had not experienced any serious eye problems.

From 1986 on, Golod was monitored by an ophthalmologist. In April 1986, while on a course of etretinate therapy, Golod complained of itching and tearing in her eyes. Dr. Grossman noted his observation of erythema (redness) and scaling of her upper and lower eyelids. He recommended that she discontinue the drug and consult an ophthalmologist. Mrs. Golod consulted with Dr. Marc A. Horowitz ("Dr.Horowitz"), a board-certified ophthalmologist. Dr. Horowitz determined that Golod had a cataract in her left eye commonly seen with psoriasis. He further determined that Golod was experiencing allergic conjunctivitis.

In June 1988, Dr. Grossman again recommended that Golod discontinue Tegison in response to her complaint of dry eyes. Golod again consulted with an ophthalmologist, Dr. Alan Greenbaum ("Dr. Greenbaum"). Dr. Greenbaum noted Mrs. Golod's complaints of blurring vision in her left eye and ocular pain. He diagnosed corneal erosion and a map-dot fingerprint corneal dystrophy in her left eye, as well as an epithelial irregularity in her right eye.

In July 1988, Golod consulted with another ophthalmologist, Dr. Henry Oksman ("Dr. Oksman"). Between July 4, 1988 and July 20, 1990 (when she last ingested etretinate), Golod consulted with Dr. Oksman on more than twenty occasions.

Dr. Oksman treated Golod for numerous ocular conditions and complaints she had at various times between July 1988 and July 1990—both when Golod was on and when she was off etretinate. These complaints and conditions included: (i) keratitis sicca; (ii) loss of epithelium; (iii) corneal ulcer; (iv) double vision; (v) conjunctivitis; (vi) keratitis; (vii) epithelial irregularity and thinning; (viii) epithelial defect and possible diplopia; (ix) keratitis sicca; (x) complaint of redness of the eye and epithelial defect; (xi) corneal ulcer, epithelial defect and keratitis sicca; and (xii) right eye swelling.

When Golod experienced ocular side effects, her dermatologist typically instructed Golod to stop taking the drug temporarily, and explained that based on his review of the package insert, (which was published in the PDR, a reference containing prescribing information for certain drugs), these side effects were expected, and that her eye problems would resolve shortly after she stopped taking Tegison. Golod had read the Tegison package insert and discussed these side effects with Dr. Grossman, but was not concerned about these adverse ocular effects, because there was no warning that these effects would be of a permanent, or a very serious nature. Golod does not remember reading literature about Tegison other than the package insert which came in the Tegison box. Moreover, Dr. Oksman had read the PDR when he began treating Golod, and based on what was represented therein, he believed that any ocular conditions suffered by Golod were transient, and would thus resolve.

## V. *Golod's Injuries*

During the first week of August 1990, approximately two and one-half weeks after stopping a course of Tegison therapy, Golod began to have extreme discomfort in her

right eye.[4] The following day, she visited her ophthalmologist, Dr. Oksman. Her symptoms worsened drastically over the next two weeks. She experienced "incredible . . . total pain 24 hours a day"; her eye became so swollen that she could no longer open it. Prior to this time she had not experienced such symptoms.

On August 16, 1990, she was admitted to Mount Sinai Hospital ("Mt. Sinai") and diagnosed with severe corneal epithelial loss, iritis, elevated intraocular pressure and glaucoma. Golod was treated with topical and systemic cortico-steroids, the standard treatment for the eye problems she was experiencing, but she did not respond to this treatment. She was also put on antiviral drugs, in the event the problems were caused by the herpes virus. Dr. Oksman described her condition as so severe that "she almost formed a plaque on the inside of the cornea, a wide plaque which opacified, almost like a calcium deposit . . . it was like a full deposit on the inner side of the cornea. You couldn't see through it, that's how thick it was . . . it wasn't the usual type of dry eye."

At Mt. Sinai, Golod was seen by several sub-specialists in ophthalmology: Dr. Oksman, Alan Friedman, M.D. ("Dr. Friedman"), and Penny Asbell, M.D ("Dr. Asbell"). These specialists at first had no conclusive opinion regarding the etiology of her eye disease,[5] but later concluded that Tegison was the most likely cause of her eye injuries. On August 29, 1990, she was discharged from Mt. Sinai with active iritis and reduced vision in her right eye. At discharge her primary treating physician, Dr. Oksman, indicated a diagnosis of either viral iritis or drug-related reaction. In a subsequent report and at his deposition, Dr. Oksman opined that no conclusive diagnosis resulted from the studies at Mt. Sinai in 1990, and thus, a drug reaction to Tegison was the most likely cause.

During the following year, from August 1990 until September 1991, Golod's right eye continued to be inflamed and had poor vision. After September 1991, Golod's vision deteriorated to the extent that she became legally blind and required two surgeries on her right eye. Golod suffered from recurrent corneal surface breakdown, corneal ulceration, iritis, glaucoma, cataract, bullous keratopathy, lens detachment and traction retinal detachment, which could not be repaired, with resultant total loss of vision in her right eye.

Golod alleges that as a result of long-term use of Tegison over a period of five years, she is permanently blind in her right eye. Her cornea is severely eroded and has almost completely disintegrated, and she must wear a cosmetic plastic prosthesis in her eye socket, a "sclera shell" with a simulated eye painted on it on one side to make it appear like an eye, over what is left of her eyeball.

## VI. *Causation Evidence*

Golod's medical witnesses have testified that, in their expert opinions, Golod's injuries were caused by the use of Tegison.

Dr. Barasch, Golod's expert witness, has testified that Tegison has a long "half-life" due to the fact that it is stored in body fat and the liver. He has opined that, with chronic use, Tegison (or its metabolite retinol) accumulates in the body and can rise to toxic levels that will persist even after the drug is discontinued because the drug continues to be released from storage.

He initially relied on a medical study, "Etretinate Therapy," written by Dr. Ellis and colleagues, which was published in 1987 in the Journal of the American Academy of Dermatology. After reading the study, Dr. Barasch called Dr. Ellis, who told him that etretinate may remain in the fat and be released into the body for an indefinite period of time. Thus, based on Dr. Ellis' theory, Dr. Barasch concluded that a toxic level of

---

4. Golod is not seeking damages for injury to her left eye. While she has suffered various problems in her left eye, her left eye has not exhibited as severe a condition as it did in 1988 and 1989, and has improved since 1990, when she stopped taking Tegison.

5. Because of the possibility that the inflammation was due to herpes, a culture was taken upon admission, using anterior chamber fluid (an "AC tap"), but no virus or other infectious agent was detected.

etretinate could exist for a long period after Golod stopped taking the Tegison.

Dr. Barasch testified that Vitamin A derivatives, such as Tegison, cause abnormal cells to be produced. He contends that when these substances reach a toxic level in a person's blood, they can adversely affect the eye, resulting in a deficiency in tear production which causes the cornea to dry, leading to a breakdown in the corneal epithelial cells.

He has concluded that this continuing toxicity resulting from the release of Tegison or its metabolite from the liver and body fat into the bloodstream in combination with continued oral ingestion, was responsible for the severity of Golod's injuries. Consistent with his theory, Dr. Barasch opined that the Tegison in toxic amounts first caused Golod to suffer "dry eye" syndrome, which led to the break down of her right cornea, followed by severe iritis (an inflammation of the iris) and, ultimately, blindness. In part because Golod's condition did not resolve with standard cortisone therapy, and in part because of the unique severity of the condition, Barasch testified that he believed Tegison was the cause of Golod's blindness.

Barasch was unable, however, to identify the blood levels at which Tegison would cause a "toxic" ophthalmological reaction, or the levels of Tegison in Golod's blood at the time of the injury. Although he provided a basis for the conclusion that Tegison is stored in body fat for extended periods, and proposed a theoretical mechanism of ocular toxicity, he produced no studies in support of this theory of toxicity.

Dr. Barasch further testified that he considered and ruled out the following possible causes of Golod's ocular injury: psoriasis, psoriatic arthritis, nonspecific dry eye syndrome, bacterial and viral causes, systemic vasculopathy, corneal epithelial dystrophy, iritis of unknown etiology, and systemic diseases like collagen vascular diseases. Dr. Barasch opined that since Golod had no common or esoteric systemic vascular or immunologic disease, that the cause of the demise of her right eye was the use of Tegison. He considered psoriasis as the most likely alternative cause, but in view of Golod's 17–year history of psoriasis without accompanying psoriatic ocular problems before taking Tegison, he concluded that ruling out psoriasis was appropriate. Barasch thus concluded that all of the ocular complications which Golod experienced were the result of the inflammation of her eye, which in turn was caused by her use of Tegison.

Dr. Barasch testified that in reaching his opinion, he relied on various sources, including Golod's medical history, the records of her treating physicians, the Hoffman studies which were conducted in the 1980's, the Tegison package inserts and PDR, as well as various medical publications.

Dr. Oksman testified that Golod's ingestion of Tegison over a period of five years most likely caused Golod's eventual loss of vision in her right eye. The determination that Tegison was the cause of her injuries to her right eye in 1990 was arrived at by consultation with various specialists. Many different causes were considered and ruled out, but the consensus of Mt. Sinai ophthalmologists was that Tegison was the cause of both the severe inflammation of the right eye and of the corneal erosion.

Dr. Friedman, one of Golod's treating ophthalmologists, who specializes in ocular pathology at Mt. Sinai, concluded in August 1990, and currently believes that Tegison caused Golod's ocular problems. Dr. Friedman based his opinion on his knowledge that Tegison is associated with ocular disease and that he had never before seen a patient who suffered from psoriasis with the severity of ocular problems that he saw in Golod's right eye.

Friedman considered and ruled out Golod's psoriasis as the cause of her ocular problems. He testified that Golod's condition was not typical of "strictly psoriatic involvement of the eye. The depth of the involvement was more than I had seen in any case of psoriasis involving the eye." Dr. Friedman testified that he considered and ruled out other causes, and although he initially believed that the cause may have been viral, he now believes that it was not infection which caused Golod's ocular problems, since viral causes were ruled out at Mt. Sinai.

Drs. Oksman and Friedman were unable to testify definitively on the mechanism by which Tegison might cause the ocular problems experienced by Golod.

## Discussion

### I. The Standard for Summary Judgment

Rule 56(e) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Silver v. City Univ.*, 947 F.2d 1021, 1022 (2d Cir.1991).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

A party seeking to defeat a summary judgment motion cannot "rely on mere speculation or conjecture as to the true nature of facts to overcome the motion." *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)). Rather, the responding party "must show the existence of a disputed material fact in light of the substantive law." *Peer Int'l Corp. v. Luna Records, Inc.*, 887 F.Supp. 560, 564 (S.D.N.Y.1995).

### II. Plaintiffs' Action Is Not Time Barred

Under New York law, a personal injury action must be commenced within three years of the date of accrual. N.Y.Civ.Prac.L. & R. 214(5). Prior to 1986, such causes of action accrued at the time of exposure to a harmful substance, despite the fact that manifestation of the injury often did not occur until well after the statute of limitations had expired. *See Schmidt v. Merchants Despatch Transp. Co.*, 270 N.Y. 287, 200 N.E. 824 (1936). In 1986, Section 214–c of the CPLR substituted the date of discovery of the injury as the date from which to compute the three-year period for commencing an action. Section 214–c now provides, in relevant part, that a cause of action for injuries caused by the latent exposure to a substance must be commenced within three years "from the date of discovery of the injury by plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier." CPLR 214–c(2).

The instant action was commenced on January 29, 1993. Accordingly, any claim based upon an injury which Golod discovered, or should have discovered, prior to January 29, 1990 is time-barred. As an initial matter, it is noted that discovery of the injury is not synonymous with discovery of the cause of the injury. In *Wetherill v. Eli Lilly & Co.*, 89 N.Y.2d 506, 655 N.Y.S.2d 862, 678 N.E.2d 474 (1997), the Court of Appeals recently held that, in cases involving exposure to toxic substances, the statute of limitations begins to run upon discovery of the injury, even where the plaintiff is unaware that the injury was caused by a particular human, rather than a natural, cause.

This holding, however, is of only tangential relevance to the instant case. Golod does not claim that the statute of limitations was tolled until such time as she discovered that her injuries were caused by Tegison. Indeed, such an argument would be unavailing in Golod's case, as there is significant evidence that she was aware that her pre–1990 ocular problems were related to Tegison.

Instead, Golod invokes the "two-injury rule," *see Fusaro v. Porter–Hayden Co.*, 145 Misc.2d 911, 913, 548 N.Y.S.2d 856, 858 (N.Y.Sup.Ct.1989), *aff'd*, 170 A.D.2d 239, 565 N.Y.S.2d 357 (1st Dep't 1991), which provides that "where the statute of limitations has run on one exposure-related medical problem, a later medical problem that is 'separate and distinct' is still actionable" under New York law. *Humphreys v. Hum-*

*phreys,* 949 F.Supp. 1014, 1020 (E.D.N.Y. 1997) (*quoting Braune v. Abbott Laboratories,* 895 F.Supp. 530, 555–56 (E.D.N.Y.1995) (Weinstein, J.); *Fusaro,* 145 Misc.2d at 915, 548 N.Y.S.2d at 856). Under the two-injury rule, " 'diseases that share a common cause may nonetheless be held separate and distinct where their biological manifestations are different and where the presence of one is not necessarily a predicate for the other's development.' " *Humphreys,* 949 F.Supp. at 1020 (*quoting Braune,* 895 F.Supp. at 555–56 and *citing Fusaro,* 145 Misc.2d at 915, 548 N.Y.S.2d at 856).[6]

Golod contends that the ocular symptoms she had discovered prior to 1990 were separate and distinct from the injuries which she discovered after July of 1990, and that she is therefore not time-barred from bringing this action based on her later injuries. Golod contends that the ocular problems from which she suffered prior to August 1990 did not lead to the permanent destruction of her right eye, for which she is now seeking damages. According to Golod, it was only when she was hospitalized in August 1990 that she first discovered in her right eye the severe inflammation, severe corneal epithelial loss, elevated intraocular pressure, a plaque-like opacity on the inner side of her cornea, and reduced vision. Subsequently, she suffered from recurrent corneal surface breakdown, corneal ulceration, iritis, glaucoma, cataracts, bullus kerathopathy and eventually, traction retinal detachment, with the resultant permanent loss of vision in her right eye.

According to Golod, she did not have a compensable injury in her right eye prior to 1990. Her injuries prior to 1990 included more transient problems including: (i) keratitis sicca; (ii) loss of epithelium; (iii) corneal ulcer; (iv) double vision; (v) conjunctivitis; (vi) keratitis; (vii) epithelial irregularity and thinning; (viii) epithelial defect and possible diplopia; (ix) keratitis sicca; (x) complaint of redness of the eye and epithelial defect; (xi) corneal ulcer, epithelial defect and keratitis sicca; and (xii) right eye swelling.

Hoffman contends that, under New York law, Golod's discovery of her pre–1990 eye injuries set the statute of limitations running on the entire constellation of her ocular injuries allegedly caused by Tegison. Hoffman points to the following facts in support of its position: Golod consulted with at least three ophthalmologists as of July 1988 who treated her for various ocular conditions including cataracts, eye pain, defects in the cornea and blurred vision; she was treated more than twenty times by Dr. Oksman prior to January 1990 for numerous conditions including corneal ulcer and abrasion, conjunctivitis, keratitis, defects in her epithelium and double vision; she knew she was taking Tegison and had read the package insert; she had received, prior to January 1990, a patient leaflet which discussed the side effects she was experiencing and informed her that such symptoms could result in permanent effects; prior to 1990, she had experienced ocular problems which she described as "prevalent" which she discussed with Dr. Grossman and which persisted for several years; she was advised by Dr. Grossman to discontinue the drug each time she had a complaint and to consult an ophthalmologist prior to resuming Tegison therapy. Hoffman contends that these facts establish that Golod discovered the injury for which she now seeks to recover more than three years before the lawsuit was commenced.

As set forth above, New York courts have recognized a two-injury rule that allows an otherwise time-barred action to proceed upon a showing that the biological manifestations of the later injury are different from those of the earlier injury, and the presence of the earlier injury is not necessarily a predicate for the later one's development. *Humphreys,* 949 F.Supp. at 1020.

Courts applying New York's two-injury rule have granted summary judgment in defendants' favor where the two injuries were caused by a continuous progression from exposure to the alleged toxin. *See, e.g., Dugan v. Schering Corp.,* 210 A.D.2d 974, 974, 620 N.Y.S.2d 689, 690 (4th Dep't 1994) (rejecting

---

**6.** In *Fusaro,* the Court applied the two-injury rule to asbestos related diseases, holding that an earlier diagnosis of asbestosis did not bar a later claim of mesothelioma. *Fusaro,* 548 N.Y.S.2d at 859.

plaintiff's assertion that bladder cancer diagnosed in 1990 was separate injury from earlier occurrence of bladder cancer diagnosed in 1976), *aff'd*, 86 N.Y.2d 857, 635 N.Y.S.2d 164, 658 N.E.2d 1037 (1995); *Sweeney v. General Printing Inc.*, 210 A.D.2d 865, 865–66, 621 N.Y.S.2d 132, 133 (1994), *Humphreys*, 949 F.Supp. at 1020.

In *Griffin v. Garratt–Callahan Co.*, 74 F.3d 36, 40 (2d Cir.1996), the Court of Appeals rejected the plaintiff's claim that his later drug addiction, seizures and fractured vertebrae were separate and distinct injuries from the earlier lung problems from which he also suffered. The Court reasoned that "his later injuries were all complications that derived from his earlier ones. His lung problems led him to take painkillers; these led to addiction; as a result of that addiction he had seizures; and the seizures were the direct cause of his fractured vertebrae."

▇ In the instant case, however, Hoffman has not met its burden, as the moving party, of demonstrating that Golod's later injuries were the result of a continuous progression from her earlier injuries. The fact that Golod's earlier and later injuries both involved her eyes, and that both injuries are alleged to have been caused by the same toxic agent, Tegison, is insufficient to establish that the two-injury rule is inapplicable. By definition, the rule applies to "diseases that share a common cause." *Humphreys*, 949 F.Supp. at 1020. Hoffman's contention that Golod's post-January 1990 injuries were simply complications of her ongoing ocular problems which had begun years earlier presents a factual issue barring summary judgment in its favor.

Prior to 1990, Golod had not been diagnosed with retinal detachment, glaucoma, or cataract, which were diagnosed for the first time after August 1990. The difference between the pre- and post–1990 diagnoses is itself some evidence that Golod's injuries, although all attributable to the same causal

agent, were not part of a single progression from injury to injury. *Compare Humphreys* (both earlier and later injuries due to diagnosis of Multiple Chemical Sensitivities); *Dugan* (both earlier and later injuries due to diagnosis of bladder cancer).

Golod, having suffered eye problems prior to 1990, nonetheless could not have known that she would later become permanently blind, as no doctor could have predicted such a course of events, given the nature of the warnings provided by Hoffman at the time. *See Braune*, 895 F.Supp. at 556; *Fusaro*, 548 N.Y.S.2d at 859–60 (noting that reason for second injury rule is that a plaintiff should not be barred from bringing a claim based on developments she had no reason to suspect earlier).[7]

Golod's failure to offer definitive medical evidence that the two injuries are separate and distinct is not sufficient grounds for summary judgment in Hoffman's favor. *But see Humphreys*, 949 F.Supp. at 1020 (granting summary judgment for defendant where plaintiff failed to offer medical evidence that diseases were separate and distinct, but not addressing whether defendant had offered proof that they were not).

The fact remains as to whether the biological manifestations of Golod's earlier injuries are different from those of her later injuries, and as to whether the presence of Golod's earlier injuries was necessarily a predicate for the development of her later injuries.

Here, a question of fact remains for the jury regarding whether Golod's earlier and later injuries were the result of a single progression from the same exposure. Thus, Golod's action will not be dismissed at this juncture as time-barred.

### III. *Genuine Issues of Material Fact Remain Regarding Whether Hoffman Breached its Duty to Warn*

Golod contends that Hoffman breached its duty to warn her physicians of the serious-

---

7. It should also be noted that Hoffman's statute of limitations defense and its alternative assertion that it should be granted summary judgment because its warnings were adequate put Golod in something of a Catch–22 position. On the one hand, Hoffman argues that Golod should have made her claim when she first experienced ocu-

lar symptoms, but on the other hand claims that it had no obligation to warn of permanent damage, such as that suffered by Golod, because such damage was unforeseeable. Thus, Hoffman argues that Golod should have foreseen an injury it claims was unforeseeable.

ness of the ocular risks of long-term Tegison use and that Hoffman's failure to warn was the proximate cause of her continued use of and ultimate injury by the drug.

■ Prescription drugs are, by their nature, inherently unsafe products, and injuries caused by them would ordinarily render the manufacturer strictly liable. However, New York law provides that a manufacturer may avoid liability if the drug is accompanied by proper directions and warnings. *Martin v. Hacker*, 83 N.Y.2d 1, 8, 607 N.Y.S.2d 598, 628 N.E.2d 1308, 1311 (1993) (citations omitted).

■ To avoid liability, the manufacturer must warn of "all potential dangers in its prescription drugs that it knew, or, in the exercise of reasonable care, should have known to exist." *Id.* (citations omitted). Drug warnings are intended for physicians, who act as "informed intermediaries" between the manufacturer and the patient/consumer, balancing the risks and benefits of various alternative treatments and supervising the effects of the chosen therapy. *Id.* (citations omitted). Thus, the manufacturer's duty to warn of potential side effects of a prescription drug "is fulfilled by giving adequate warning through the prescribing physician, not directly to the patient." *Id.*

Hoffman contends that the information on Tegison that it disseminated to physicians and patients adequately warned of the risk of the injury Golod suffered. Alternatively, Hoffman contends that the warnings given were adequate at the time they were given, because even if the package inserts and other materials did not warn of the possibility of the injury Golod actually suffered, Hoffman did not know and had no reason to know of the risk of such an injury, and thus had no duty to warn of it. Finally, Hoffman contends that even if the warnings were inadequate, any inadequacy was not the proximate cause of Golod's injuries, because Golod's dermatologist would have prescribed Tegison even if the warnings had been different. Each of these contentions will be considered in turn.

## A. The Warnings of Ophthalmic Side Effects

■ Often, "whether a warning is adequate is an issue of fact to be determined at trial." *Erony v. Alza Corp.*, 913 F.Supp. 195, 199 (S.D.N.Y.1995). *See also, Bukowski v. CooperVision Inc.*, 185 A.D.2d 31, 33, 592 N.Y.S.2d 807, 808–09 (3d Dept.1993); *Basko v. Sterling Drug, Inc.*, 416 F.2d 417, 426–27 (2d Cir.1969) (in case arising under Connecticut law, adequacy of warning was issue for jury).

■ However, "[a] warning for a prescription drug may be held adequate as a matter of law if it provides specific detailed information on the risks of the drug." *Martin*, 83 N.Y.2d at 10, 607 N.Y.S.2d 598, 628 N.E.2d 1308. In determining whether a particular warning is adequate as a matter of law, a court must consider several factors, including "whether the warning is accurate, clear, consistent on its face, and whether it portrays with sufficient intensity the risk involved in taking the drug." *Id.* A court is to "examine not only the meaning and informational content of the language but also its form and manner of expression." *Id.*

■ Golod contends that an issue of fact remains as to whether Hoffman's warning was adequate because the Tegison warnings did not fully apprise a reasonable treating physician of the risk of the precise injury which Golod suffered—permanent loss of vision in her eye resulting from severe corneal erosion and iritis that led ultimately to an irreparable retinal detachment.

The package inserts and the Physician's Desk Reference advise that there are adverse ocular effects associated with the use of Tegison. The inserts, for example, specifically warn of "[c]orneal erosion, abrasion, irregularity and punctuate staining" and "corneal opacities" occurring in patients using Tegison. The inserts also indicated the occurrence of iritis and blot retinal hemorrhage associated with Tegison therapy.

Golod's medical witnesses have testified that the course of events leading to her blindness began with severe corneal erosion and opacities and/or iritis that were non-responsive to standard therapy. Thus, the

package inserts did specify the general type of side effect—corneal abnormalities and iritis—that led to the demise of Golod's eye. However, with respect to the corneal problems, the inserts indicated that the side effects were temporary and resolved after Tegison was discontinued. Golod has produced evidence that the corneal effects were not temporary in her case but persisted and worsened after Tegison was discontinued.

Although the package insert warns of iritis, there is no indication that cases of iritis had been persistent or severe, or could lead to permanent visual impairment. Golod has introduced evidence that her iritis was unusually severe and resistant to standard topical and systemic corticosteroid treatment.

The Tegison Patient Information states that a patient may develop "eye irritations" and that a patient should "check with [her] doctor to determine if any change in the amount of [her] medication is needed." The patient leaflet also contains a capitalized warning that Tegison "may cause some more serious side effects, including ... blurred vision ... persistent feeling of dryness of the eyes" and that these may be signs of "more serious" side effects which "if left untreated" could possibly result in permanent effects. However, the Patient leaflet does not specify what these "more serious" and "possibly permanent" effects are.

■ Plaintiffs contend that the language Hoffman used to describe possible adverse effects did not effectively convey the seriousness of those effects. "It is basic that a warning 'must be commensurate with the risk involved in the ordinary use of the product.'" *Martin,* 83 N.Y.2d at 11, 607 N.Y.S.2d 598, 628 N.E.2d 1308 (*quoting Cooley v. Carter–Wallace, Inc.,* 102 A.D.2d 642, 645, 478 N.Y.S.2d 375 (4th Dept.1984)) Thus, the language of a warning must be "direct, unequivocal and sufficiently forceful to convey the risk." *Martin,* 83 N.Y.2d at 11, 607 N.Y.S.2d 598, 628 N.E.2d 1308.

It cannot be said, as a matter of law, that the Tegison warnings adequately disclosed a risk of permanent corneal deterioration or severe iritis which could result in the permanent and complete loss of vision. A reasonable juror could conclude that the patient leaflet, which is the most strongly worded of all the warnings issued by Hoffman, implies that if the patient is "treated," *i.e.,* visits an ophthalmologist, there will be no permanent effects. Thus, the Tegison warnings lack emphasis, clarity and a sense of urgency commensurate with a risk of total and irreversible loss of vision.

Hoffman contends that because it warned of adverse effects on the cornea and iris, some of which Golod did experience in her left eye in 1988 and 1989, and some of which she experienced to a lesser degree in her right eye prior to 1990, that it is entitled to summary judgment. However, it is the permanent and complete blindness resulting from the severe and permanent deterioration of her cornea and severe and persistent iritis in 1990 for which Golod seeks damages, whether or not she may have suffered other milder effects of which Hoffman warned.

Hoffman's adequate warning of milder ophthalmic risks associated with Tegison use did not absolve it of a duty to warn of more severe permanent ones of which it knew or had reason to know. The decision in *Erony* is instructive. In that case, although the package insert advised physicians and patients to keep the drug out of the reach of children and warned that the drug could cause severe hypoventilation requiring medical treatment, the court held that a reasonable jury could find that the warnings were incomplete because they did not state that oral ingestion could cause hypoventilation serious enough to result in death. *Erony,* 913 F.Supp. at 200. Similarly, although the warnings here stated that Tegison could cause ocular abnormalities, they did not state that these abnormalities could lead to permanent blindness. *See also, Hermes v. Pfizer, Inc.,* 848 F.2d 66, 68 (5th Cir.1988) (warning of temporary "extrapyramidal symptoms" did not excuse duty to warn of permanent symptoms of same type).

Hoffman cites a number of cases in which warnings were held adequate as a matter of law. In each of those cases, the warnings identified the precise adverse effect suffered by the plaintiff and the seriousness of that effect. In *Martin,* for example, the defen-

dant's drug caused plaintiff to become depressed and eventually suicidal. However, the package insert for the drug at issue explicitly warned that the drug could induce depression, that the depression could persist after the drug was discontinued, and that the depression could be severe enough to result in suicide. 83 N.Y.2d at 11, 15, 607 N.Y.S.2d 598, 628 N.E.2d 1308. *See also Eiser v. Feldman,* 123 A.D.2d 583, 583–84, 507 N.Y.S.2d 386, 387 (1st Dep't 1986) (plaintiff who experienced visual blockage in eye adequately warned where package insert, PDR and patient literature regarding drug expressly stated possibility of blindness or partial visual blockage); *Wolfgruber v. Upjohn Co.,* 72 A.D.2d 59, 423 N.Y.S.2d 95 (4th Dep't 1979), *aff'd,* 52 N.Y.2d 768, 436 N.Y.S.2d 614, 417 N.E.2d 1002 (1980) (no liability where manufacturer warned in package insert and PDR of risk of diarrhea and/or colitis, "the precise malady incurred by plaintiff"); *Glucksman v. Halsey Drug Co.,* 163 A.D.2d 163, 553 N.Y.S.2d 724 (1st Dep't 1990) (no liability where plaintiff suffered "bilateral aseptic necrosis of the femoral head" after ingesting prednisone, and PDR and package inserts expressly listed this specific condition as possible adverse reaction, but physician knowingly chose not to warn patient).

Accordingly, because there is evidence that the Tegison warnings did not adequately convey the possibility of the ocular injuries actually suffered by Golod, summary judgment may not be granted on the basis of the adequacy of the warning of those injuries.

**B.** ***Whether Hoffman Knew or Should Have Known of the Dangers of Tegison***

Hoffman next contends that it had no duty to warn of the serious and irreversible ophthalmic effects suffered by Golod because these effects were not reasonably foreseeable at the time Golod was taking Tegison.

A pharmaceutical manufacturer has a duty to warn of dangers of which it knows, or in the exercise of reasonable care, should have known. *See Martin,* 83 N.Y.2d at 8, 607 N.Y.S.2d 598, 628 N.E.2d 1308; *Lindsay v. Ortho Pharmaceutical Corp.,* 637 F.2d 87, 91 (2d Cir.1980). The manufacturer has a duty to adequately test its drugs. *See Enright v. Eli Lilly & Co.,* 77 N.Y.2d 377, 387–88, 568 N.Y.S.2d 550, 555–56, 570 N.E.2d 198, 203–04 (1991) (manufacturers should not "enjoy immunity from liability stemming from their failure to conduct adequate research and testing prior to marketing of their products"). Moreover, a drug maker has a "continuing obligation" to "keep abreast of knowledge of its product as gained through research, adverse reaction reports, scientific literature and other available methods." *Baker v. St. Agnes Hospital,* 70 A.D.2d 400, 406, 421 N.Y.S.2d 81, 85 (2d Dept.1979); *accord Lindsay,* 637 F.2d at 91.

Golod contends that Hoffman should have known of the danger of permanent blindness because Adverse Experience Reports and FDA computer printouts summarizing reports of adverse reactions for both Tegison and Accutane should have alerted Hoffman to the risk of permanent blindness.

Hoffman urges that these documents are inadmissible, and thus may not be considered on this motion. *See* Fed.R.Civ.P. 56(e); *Maier–Schule GMC, Inc. v. General Motors Corp.,* 154 F.R.D. 47, 59 (W.D.N.Y.1994) (nonmoving party may not rely on inadmissible evidence to avoid summary judgment). Hoffman contends that these documents are hearsay not within an exception. However, the reports are not hearsay, because they are offered not as proof of the fact that Tegison caused the reported blindness, but as evidence that Hoffman was on notice of potentially serious optical side effects, and thus "should have known" and warned of such risk. Hoffman also attacks the reliability and relevance of the reports, contending that they are merely anecdotal reports and that Golod has not demonstrated that the incidents they relate are sufficiently similar to her experience to be relevant. While the reports may not be sufficiently reliable or relevant to be admissible on the issue of causation, *see Wade–Greaux v. Whitehall Laboratories,* 874 F.Supp. 1441, 1481 (D.Vi. 1994), *aff'd,* 46 F.3d 1120 (3d Cir.1994), they are relevant to Hoffman's awareness of potentially serious ophthalmological effects and the possible need to conduct further research into them. *Cf. DeLuca v. Merrell Dow Phar-*

*maceuticals,* 791 F.Supp. 1042, 1050 (D.N.J. 1992) (Drug Experience Reports cannot be used to prove causation, but may be "stimulus for further study"), *aff'd,* 6 F.3d 778 (3d Cir.1993).

■ Hoffman also contends that evidence of the side effects of Accutane should not be admitted because there is insufficient evidence that the side effects of Accutane and Tegison are similar. However, there is enough evidence in the record of similarities in side effects among the retinoids to permit consideration of Hoffman's experience with Accutane on the issue of whether Hoffman should have known of the potential for serious ophthalmological effects of Tegison. The package insert notes that Tegison's adverse event profile is similar to other Vitamin A compounds. Dr. Barasch's testimony also provides some evidence that Vitamin A derivatives, including Tegison and Accutane, have similar side effects. Hoffman's own witnesses have conceded that there are some similarities in the side effects caused by retinoids. *See Basko* 416 F.2d at 426–27 (where evidence "fairly established" that two drugs produced same idiosyncratic side effect, question of whether warning as to either drug was adequate was for jury); *but see Hoffman v. Sterling Drug, Inc.,* 374 F.Supp. 850, 862 (M.D.Pa.1974) (rejecting evidence of side effects of drug in same chemical family, on grounds probative value of such evidence was outweighed by jury confusion and waste of time on collateral issue of similarity).

■ Hoffman also contends that this evidence, even if admissible, does not support the contention that it failed to warn of foreseeable risks. The cursory descriptions contained in these reports may be rather thin evidence of the foreseeability of irreversible blindness from long-term Tegison use, particularly in light of the fact that the one long-term study of Tegison available at the time did not find any risk of blindness.[8] However, they do indicate that blindness and other permanent or persistent ocular symptoms have occurred in patients using Tegison and related compounds, and thus raise a question

of fact for trial as to whether Hoffman had sufficient information to give rise to a duty to warn of such effects. *See Hermes,* 848 F.2d at 68 (FDA computer printout of adverse drug reaction reports supports jury finding that defendant had knowledge of side effects sufficient to trigger duty to warn); *Basko,* 416 F.2d at 426 (whether risk of retinopathy was either knowable or reasonably foreseeable at a time when plaintiff was still taking drug was for jury); *See Bukowski,* 185 A.D.2d at 33–34, 592 N.Y.S.2d 807 (testimony of defendant-manufacturer's witness that incidence of corneal ulcers resulting from use of defendant's product was less than⅟₁₀₀₀% did not support summary judgment in favor of defendant on issue of failure to warn where plaintiff presented clinical reports, adverse effect abstracts and other information).

On a motion for summary judgment, it is not the Court's role to weigh evidence, but only to determine whether there is an issue of fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). Accordingly, summary judgment will not be granted on the ground that the harm that befell Golod was unforeseeable.

### C. *Failure to Warn as Proximate Cause*

■ A plaintiff suing a prescription drug manufacturer on a failure to warn theory must prove that the failure to warn was a proximate cause of the plaintiff's injury. *See Glucksman,* 160 A.D.2d at 307, 553 N.Y.S.2d 724; *Bravman v. Baxter Healthcare Corp.,* 984 F.2d 71, 75 (2d Cir.1993); *Erony,* 913 F.Supp. at 200. Thus, the plaintiff must generally demonstrate that had appropriate warnings been given, the treating physicians would not have prescribed or would have discontinued use of the drug. *See Krasnopolsky v. Warner–Lambert Co.,* 799 F.Supp. 1342, 1347 (E.D.N.Y.1992) (treating physician's statement that he would prescribe drug even if adequately informed severs causal relationship between failure to warn and plaintiff's injury).

8. Golod contends that this study was deficient in various respects. The weight which this study is given, both on the issue of Hoffman's duty to

warn and the issue of causation, will be for the jury.

Defendants contend that any inadequacy of its warning was not a proximate cause of Golod's injuries because Dr. Grossman, who prescribed Tegison for Golod, has testified that he believes Hoffman's warnings are adequate despite Golod's blindness and has not changed his practices in prescribing Tegison since her injury.

However, unless a physician's claim that she would have prescribed a drug even if adequately warned is self-disserving, the credibility of such a claim is generally a jury question not to be resolved on a motion for summary judgment. *See Bravman,* 984 F.2d at 75. Here, because Dr. Grossman is not a defendant in this action, his statement is not self-disserving in any meaningful way.

Moreover, Dr. Grossman's affidavit is ambiguous. He has not stated that even if he was warned of a risk of permanent blindness, he would still have continued Golod on Tegison despite her initial eye complaints. Instead, he has expressed an opinion that the Tegison warnings are adequate. This may be because he believes that Tegison does not cause blindness, rather than because he thought the warnings were adequate even if Tegison does cause blindness. His further statement, that he has not changed his prescribing practices with respect to Tegison, may simply reflect his belief that the warnings were adequate. It does not amount to an assertion that he would have prescribed the drug to Golod in the face of a risk of blindness.

In addition, Dr. Oksman, Golod's ophthalmologist since 1988, knew that she was taking Tegison and has indicated that he would have recommended that she cease using the drug if the PDR had warned of the risk of permanent ocular adverse effects. Thus, even if Dr. Grossman would have continued prescribing Tegison, another of Golod's physicians would have recommended that she stop.

Accordingly, a question of fact remains regarding whether Hoffman's alleged failure to warn was a proximate cause of her continued ingestion of the drug.

## IV. *Causation of Injury*

Golod has produced the opinion testimony of three ophthalmologists, Drs. Friedman, Oksman, and Barasch, who concluded that Tegison most likely caused her injury. All three formed their opinions, in whole or in part, by ruling out other likely causes of Golod's ophthalmological condition.[9] Hoffman contends that these opinions are insufficient to create a genuine issue of material fact on the issue of whether Tegison caused Golod's injury.

In *McCulloch v. H.B. Fuller Co.,* 61 F.3d 1038, 1043–1045 (2d Cir.1995), the Court held that it was proper for the trial court to admit the opinion of plaintiff's expert physician that the plaintiff's throat ailment was caused by inhalation of the defendant's product and sustained the jury's verdict for the plaintiff on the basis of this causation evidence. The defendant argued that because the expert "could not point to a single piece of medical literature" stating that its product caused the specific injury suffered by plaintiff, and because the expert came to his conclusion as to medical causation by using "differential etiology", that the expert's opinion should have been excluded. "Differential etiology" is the process by which the cause of a disease or condition is determined by considering and eliminating other possible causes.

The Second Circuit held that the expert physician, who was an experienced medical doctor practicing in the specialty of ear, nose and throat for approximately thirty years, was sufficiently qualified to give expert testimony on a throat ailment and its causes. Moreover, the Court reasoned that with respect to the expert's methodology, it was not necessary that there be textual authority to support his opinion in order for that opinion to be put before the jury.

The Court noted that the doctor based his expert opinion on:

a range of factors, including his care and treatment of [plaintiff]; her medical histo-

---

9. Dr. Barasch also based his opinion on his theory that the release of stored Tegison or its metabolite from the fat and liver into the bloodstream can result in toxic levels of retinol in the blood, which cause ocular injuries. This theory is discussed in the following section.

ry (as related by plaintiff and derived from a review of medical and surgical reports); pathological studies; a review of the manufacturer's product warnings; the doctor's training and experience; and the use of a scientific analysis known as differential etiology (which requires listing possible causes, then eliminating all causes but one); and references to various scientific and medical treatises.

61 F.3d at 1044.

The Court stated, that "faults in [the expert's] use of 'differential etiology' as a methodology, or lack of textural authority for his opinion, go to the weight, not the admissibility of his testimony." *Id.* (citing *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 595–97, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469 (1993)). *Accord, Maiorana v. U.S. Mineral Prods. Co.,* 52 F.3d 1124, 1136 (2d Cir.1995) (reversing district court's grant of judgment as a matter of law and holding that district court improperly undertook weighing of scientific evidence).

Moreover, in *Lappe v. American Honda Motor Co., Inc.,* 857 F.Supp. 222 (N.D.N.Y. 1994), *aff'd,* 101 F.3d 682 (2d Cir.1996), the court noted that "weaknesses in the methodology and investigation of [a] particular expert might lead the trier of fact to discount his opinions" but "*Daubert* only prescribes judicial intervention for expert testimony approaching the outer boundaries of traditional scientific and technological knowledge." *Id.* at 228.

Here, Hoffman contends that because they have provided no "reliable scientific support" for their opinion that Tegison causes corneal abnormalities and iritis, the ophthalmologists' opinions should be rejected. However, like the expert physician in *McCullock,* their opinions raise an issue of fact for trial. Their opinions on causation are based upon their collective training and experience; Golod's medical history, including the reports and records of her physicians; the hospital records; various scientific and medical abstracts and treatises; the Tegison package insert and PDR; and certain reports issued by defendant to the Drug Advisory Committee of the FDA, including test reports conducted by defendant. Although these sources do not definitively prove causation or establish a mechanism of toxicity, they are a sufficient basis upon which to base a medical opinion. The fact that these physicians are unable to describe the mechanism by which Tegison caused its adverse effects is irrelevant. The mechanisms of both therapeutic and toxic effects of drugs are often unknown. As indicated in the PDR and package inserts, Hoffman does not know the mechanism by which Tegison produces its therapeutic effects, but the documentation of its efficacy by clinical trials suffices to support a claim that it causes those beneficial effects. Just as the mechanism of efficacy need not be known to support a claim that Tegison causes abatement of dermatological symptoms, so the mechanism of toxicity need not be known to support an inference of causation based on accepted clinical methods of diagnosis.

Like the expert physician in *McCullock,* Drs. Barasch, Friedman and Oksman used a scientific analysis known as differential etiology or differential diagnosis to rule out other possible causes of Golod's injuries, leaving Tegison as the most likely etiologic agent. This methodology is accepted in this Circuit and other jurisdictions. *See McCullock,* 61 F.3d at 1044; *McEwen v. Ortho Pharmaceutical Corp.,* 270 Or. 375, 414, 528 P.2d 522, 541 (Or.1974) (causation adequately proved by expert who, after considering and discounting various diseases which also could have caused the condition, concluded that plaintiff's detachment of and holes in her retina were caused by ingestion of defendant's drug).

Hoffman contends that Golod's experts' testimony should be discounted because they did not consider and exclude all possible causes for Golod's ocular problems. Specifically, they contend that various of the doctors failed to consider and rule out psoriasis, psoriatic arthritis or a viral infection as the causes.

However, Dr. Barasch has testified that he considered and ruled out all of these possible causes. Although Dr. Friedman did not specifically rule out psoriatic arthritis at the time Golod was in the hospital, he has testified subsequently that he is aware of the ocular effects of both psoriasis and psoriatic

arthritis and still considers Tegison the most likely cause of Golod's condition. Although he was hesitant to rule out a viral infection conclusively because he did not see the lab report on an Anterior Chamber tap ("AC tap") to determine if there was virus present in the fluid behind the cornea, he knew the test was done and assumed that it was negative because he did not hear otherwise. Dr. Oksman's testimony also establishes that he considered and ruled out a viral cause based on the results of the AC tap.

 Moreover, to the extent that these physicians did not fully consider and rule out all possible causes, such deficiencies in the application of the method generally go to the weight of the evidence. *See McCullock*, 61 F.3d at 1044. It is for the jury to determine the weight to be given to the ophthalmologists' conclusions, after thorough cross-examination and the presentation of contrary evidence. Furthermore, under New York law "a plaintiff need not disprove every possible ground of causation suggested by the manufacturer in order to prove causation." *Tinnerholm v. Parke Davis & Co.*, 285 F.Supp. 432, 440 (S.D.N.Y.1968), *aff'd in relevant part, modified on damages*, 411 F.2d 48 (2d Cir.1969). When there are several risk factors that can explain a plaintiff's injury, the plaintiff must provide some evidence of why those other causes are inapplicable. *See Wheat v. Pfizer, Inc.*, 31 F.3d 340, 342–43 (5th Cir.1994). Here, Golod's physicians considered and ruled out the most likely alternative causes on various grounds. They ruled out a viral etiology by testing ocular fluid for the presence of viral agents. They ruled out psoriasis and psoriatic arthritis because Golod had not experienced ocular symptoms before taking Tegison, despite a 17–year history of the disease, and because they had never seen a case of such extreme ocular problems caused by psoriatic conditions.

Hoffman also points out that Dr. Penny Asbell, an ophthalmologist at Mt. Sinai, and Dr. Leslie Kerr, a rheumatologist at Mt. Sinai, attributed Golod's ophthalmic symptoms to her underlying psoriatic arthritis, rather than to Tegison. This disagreement among experts presents a factual question for jury determination. It does not negate the other physicians' opinions.

Accordingly, questions of fact with respect to causation remain for the jury.

### V. *Barasch's Theory of Caution*

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court assigned district judges a "gate-keeper" function in determining whether scientific evidence is admissible. The court fulfills this function b § "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597, 113 S.Ct. at 2799. In announcing this rule, the Court abandoned the *Frye* test, which had required that scientific evidence have general acceptance in the relevant scientific community in order to be admissible, in favor of a more flexible rule that was more lenient in permitting expert testimony. *Id.* at 588–89, 113 S.Ct. at 2794–95. The Court stated that "vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596, 113 S.Ct. at 2798.

Under *Daubert*, "scientific knowledge" implies that the expert arrived at her conclusion using the methods and procedures of science and that the conclusion is "more than subjective belief or unsupported speculation." *McCullock*, 61 F.3d at 1043–44 (quoting *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795.) A district judge is to consider a variety of factors in determining whether an expert's proffered testimony is admissible as "scientific knowledge," including: (1) whether the theory has been or can be tested; (2) whether the theory has been subject to peer review or been published; (3) when a particular technique is used, that technique's known rate of error; and (4) the extent of acceptance of the theory in the relevant scientific community. *Daubert*, 509 U.S. at 593–94, 113 S.Ct. at 2796–97.

Hoffman contends that Dr. Barasch's theory of prolonged Tegison toxicity resulting from the continuous release of Tegison or retinol from the liver and fatty tissues does

not pass muster as scientific evidence under *Daubert.* This argument was made in connection with the summary judgment motion. However, because Golod's causation evidence is sufficient to survive summary judgment without Dr. Barasch's toxicity theory, it will be treated as a motion in limine to exclude testimony on this theory at trial.

As an initial matter, Dr. Barasch's testimony that Tegison is stored in the fat and the liver appears to have support in the medical literature. At his deposition, Dr. Barasch quoted a published study stating that "After continuous administration, etretinate and its active metabolite accumulate in fat and plasma, and half-lives increase as a function of duration of treatment." There is also little question that the toxicity of Tegison persists for some time after the patient stops taking the drug. Because of potential teratogenicity, Hoffman advises that women not become pregnant for two years after the cessation of Tegison therapy. There is also scientific support for the proposition that vitamin A derivatives produce ocular side effects, including corneal abnormalities and, less frequently, iritis. However, the scientific literature indicates that these effects are temporary and relatively mild.

The novel aspect of Dr. Barasch's hypothesis is his proposition that the release of Tegison or its metabolite from storage in body tissues, in combination with continued oral ingestion of Tegison, can raise the concentration of circulating Tegison to extremely toxic levels and that such levels of Tegison persist and cause more extreme ocular consequences than previously noted. He contends that so long as the concentration of Tegison in circulation is less than the concentration in the fat and liver tissues, stored Tegison is released into circulation, elevating blood Tegison levels above the level that oral ingestion alone would produce. The elevated levels are purportedly more toxic to the eye than lower levels. Dr. Barasch also proposes a mechanism for the ocular toxicity of Tegison. He claims that Tegison, like vitamin A, causes abnormal changes in epithelial cells in the eye and that the dead epithelial cells block secretion of oils and mucus, two components of tears, into the eye. The loss of these components leads to dry eye syndrome. When the eye is dry, the cornea begins to break down. Moreover, Dr. Barasch claims that Tegison acts to directly break down and erode the corneal epithelium, in the same manner that it breaks down other epithelial cells. Because Tegison remains in the body for such an extended period of time, Dr. Barasch surmises that the dry eye syndrome and corneal breakdown continue even after Tegison is discontinued, thus leading to more severe consequences than occur with use of retinoids with shorter half-lives.

Dr. Barasch has provided no direct scientific evidence to support these novel aspects of his theory. From what appears in the record, the hypothesis has not been previously advanced in the scientific literature or otherwise been subjected to peer review, such as through a grant application process. Moreover, there is no evidence that Dr. Barasch's theory has achieved any acceptance (or rejection) in the medical community.

There is no evidence that the hypothesis has been formally tested by clinical trials, in animal studies, or otherwise. While, Dr. Barasch's hypothesis may be "testable" or "falsifiable" by experimental or epidemiological techniques, see *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796–97 ("a key question" is whether hypothesis can be falsified), he has not indicated how such testing might be practically undertaken using current scientific methods. A court should not be charged with determining how a study testing a hypothesis would be conducted, since the proponent of challenged scientific evidence bears the burden of demonstrating its admissibility by a preponderance of the evidence. *Daubert,* 509 U.S. at 592 n. 10, 113 S.Ct. at 2796 n. 10.

As a result, although Dr. Barasch's theory may be biologically plausible, it does not constitute "scientific knowledge" within the meaning of *Daubert.* Instead, it is, at most, scientifically-grounded speculation: an untested and potentially untestable hypothesis. Although there may be circumstances in which a scientific hypothesis that is, practically speaking, untestable, would nevertheless be admissible, perhaps because of general acceptance in the scientific community,

this is not such a case. "[T]he courtroom is not the place for scientific guesswork, even of the most inspired sort. Law lags science; it does not lead it." *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 319 (7th Cir.1996).

Accordingly, unless Golod comes forward with additional support for Dr. Barasch's theory of ocular toxicity prior to trial, he will not be permitted to testify as to that theory.

### Conclusion

For the reasons set forth above, Hoffman's motion for summary judgment is hereby denied. In addition, the proffered testimony of Dr. Barasch with respect to his hypothesis as to the biological mechanism by which Tegison caused Golod's injuries will be excluded at trial unless further scientific support for the hypothesis is adduced prior to trial.

The parties will appear for a pretrial conference on May 28, 1997 at 4:30 PM, or such other date as may be convenient for counsel.

It is so ordered.